Filed 12/13/13  In re Madison W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

In re MADISON W. et al., Persons Coming Under the Juvenile Court Law.

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

      Plaintiff and Respondent,

      v.

MARY W.,

      Defendant and Appellant.

D063971

(Super. Ct. No. J517870A-B)

APPEAL from orders of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Alice C. Shotton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Mary W. appeals juvenile court orders denying her petition for modification under Welfare and Institutions Code section 388 (statutory references are to the Welfare and Institutions Code), and terminating her parental rights to her minor daughters, Madison W. and Elizabeth W. (together, the minors), under section 366.26. Mary contends the court erred by denying her section 388 modification petition by which she sought to have the minors returned to her custody or, alternatively, to have unsupervised visits with them. She further asserts the court should have applied the beneficial parent-child relationship exception to adoption to preclude terminating her parental rights. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2010, six-year-old Madison and one-year-old Elizabeth became dependents of the juvenile court under section 300, subdivision (b) and were removed from parental custody based on findings Mary and the minors' father, Heath W., exposed them to domestic violence. The home contained a loaded shotgun, narcotics and drug paraphernalia. Mary had a history of alcohol abuse and had been arrested recently for driving under the influence (DUI). The court placed the minors with the paternal grandmother and ordered reunification services for Mary.

During the next six months, Mary completed a parent education course and domestic violence treatment. She had only one positive test for alcohol and completed

2

her outpatient substance abuse treatment program. At the six-month review hearing, the court placed the minors with Mary. In September 2011, the court terminated its jurisdiction.

Six weeks later, the San Diego County Health and Human Services Agency (Agency) filed a new petition under section 300, subdivision (b), alleging the minors were at substantial risk of harm as a result of Mary's alcohol abuse. The minors were detained with the paternal grandmother, with whom they had lived during the first dependency case.

Agency's investigation showed Mary had been drinking vodka at a friend's home and attempted to drive home with the minors in the car. She ran into a guardrail on the freeway and hit another car. The police arrested her for child endangerment, hit and run, and DUI. Mary was on probation for her prior DUI conviction. She denied having a problem with alcohol, and claimed she drank beer only a few times a week. The social worker noted Mary, who admittedly began drinking when she was 15 years old, was unable to remain sober and had gained very little insight into how her alcohol abuse impacted her parenting. Mary continued to minimize the seriousness of the DUI incident and denied that she needed services. Despite completing drug court services in the earlier dependency case, she continued to drink alcohol. She was having supervised visits with the minors twice a week.

At the jurisdiction and disposition hearing, the court sustained the allegations of the petitions, declared the minors dependents, removed them from parental custody and placed them with the paternal grandmother. The court ordered reunification services for

3

Mary, including supervised visits, with the possibility of unsupervised and overnight visits.

During the next six months, Mary was visiting the minors three times a week and having overnight visits on weekends, supervised by the maternal grandmother. Mary was enrolled in substance abuse treatment and had been testing clean. She was also participating in a parenting class, individual therapy and a DUI program. She attended four 12-step meetings a week and had a sponsor. At the six-month review hearing, the court ordered further services and unsupervised visits for Mary.

Two months later, Agency successfully petitioned under section 388 to have Mary's visits with the minors revert to supervised. Mary had recently tested positive for alcohol and methamphetamine, and she twice submitted diluted urine tests. The social worker noted Mary's substance abuse was increasing, despite her recent treatment. The social worker was concerned because Mary was in denial and refused to accept responsibility for her substance abuse. Mary's therapist and her probation officer shared the social worker's concern, and recommended a residential recovery program for Mary. Mary continued to test positive for methamphetamine and alcohol, and eventually entered an inpatient substance abuse treatment program.

Minors' counsel filed a section 388 petition, seeking to have the court terminate Mary's services and set a section 366.26 selection and implementation hearing. Counsel alleged it was not in the minors' best interests to keep them on an emotional roller coaster, and they deserved permanency and stability. Madison was having difficulty adjusting to the changes since Mary's relapse, but her temper tantrums and behavioral

4

issues improved once she began individual therapy. Elizabeth seemed more relaxed when there were no visits with Mary. When the minors did visit Mary, they reacted negatively. Elizabeth screamed and cried before visits. She was anxious and had enuresis. Elizabeth viewed the paternal grandmother as her protector, and had difficulty separating from her. Madison acted out after visits, and reverted to infantile behavior. She felt unstable as a result of Mary's relapse and inconsistent behavior. Following a contested hearing, the court granted the section 388 petition, terminating Mary's services and setting a selection and implementation hearing.

Agency assessed the minors as generally and specifically adoptable. They had been living with the paternal grandmother for the past 17 months, and had also lived with her for eight months during the first dependency. The paternal grandmother, who was able to meet the minors' needs, was committed to adopting them.

Mary had regularly visited the minors throughout the case. She completed her residential drug treatment program in December 2012, attended an aftercare program once a week and had clean drug tests between January and March 2013. The social worker observed two visits between the minors and Mary, noting the minors appeared happy to see her and greeted her by calling out, "Mommy." Mary brought food for the minors. They were comfortable in her presence and enjoyed the attention they received from her. At the end of visits, the minors hugged Mary and said goodbye. Neither child showed any distress when separating from her. In the social worker's opinion, it would not be detrimental to the minors to terminate parental rights.

Mary filed a section 388 modification petition, seeking to have the court place the minors with her or, alternatively, to have unsupervised visits with them. The petition alleged Mary's circumstances had changed because she had substantially complied with her case plan, and it would be in the minors' best interests to grant the requested modification. The court ordered a hearing on the petition.

Agency opposed the modification, noting Mary had a history of completing treatment programs and then relapsing. She still had not enrolled in a child abuse class as required in her criminal case. After completing inpatient substance abuse treatment, Mary did not have to drug test. She was no longer in individual therapy, but was now participating in a group that met twice a week to learn about the various symptoms of bipolar disorder and how to manage them. Supervised visits between Mary and the minors continued to go well. The minors experienced no emotional distress when visits ended.

At the combined section 388 and section 366.26 hearing, social worker Lerone Jenkins testified he had confirmed that Mary completed residential treatment and an aftercare program. He observed six to eight visits between Mary and the minors, which he described as positive. Mary was currently living with the maternal grandfather and his wife. Their home had a bedroom available for the minors. When Jenkins asked Madison where she wanted to live, she vacillated between wanting to stay with the paternal grandmother and wanting to be with Mary. She also vacillated about whether she wanted to be adopted. Although Jenkins stated Madison was very bonded to Mary, he believed

6

the benefits of adoption outweighed any detriment Madison would experience from terminating that relationship.

Jenkins testified Mary had a history of complying with the requirements of her case plan followed by actions that showed she had not made the changes necessary to mitigate the protective issues. Mary continued to have inappropriate discussions with the minors about where they would live, and she was unable to put the minors' needs before her own. Despite having received therapy, Mary could not manage her coping skills.

Jenkins assessed Mary's relationship with Madison as one of siblings. They were physically affectionate with each other, but boundaries were poor. They conversed about their respective boyfriends. Madison had had to keep Mary's secrets with respect to drinking and drug use. She was very loyal to her mother and wanted to fix her situation. If Madison were returned to Mary's custody, it was unlikely that she would report any unsafe behavior. When visits decreased, Madison did not complain and her negative behaviors improved. In Jenkins's opinion, Madison was in need of stability.

Jenkins further testified Mary did not have a parental role as to Elizabeth. Mary could not redirect Elizabeth during visits. When visits decreased, Elizabeth's negative behaviors improved. Elizabeth viewed the paternal grandmother as her primary caregiver, and she saw Mary as an extended family member.

In recommending adoption, Jenkins noted the minors were in need of stability with a caregiver who could ensure their safety. They had experienced much turmoil, causing them emotional distress. Adoption would allow them to thrive in a stable environment.

7

Mary testified, stating she had been sober for eight months. She completed a residential substance abuse program and an aftercare program, attended Alcoholics Anonymous (AA) meetings and had a sponsor. All her drug tests had been negative. She continued to take her medication for bipolar disorder and had also been diagnosed with posttraumatic stress disorder. Mary admitted she needed individual therapy but had not completed it.

Mary visited the minors once a week for three hours. She brought them snacks and enjoyed interacting with them. She denied telling Madison to keep secrets.

After considering the evidence and arguments of counsel, the court denied Mary's section 388 petition. The court then found the minors were likely to be adopted and none of the exceptions to adoption applied to preclude terminating parental rights.

DISCUSSION

I

Mary contends the court erred by denying her section 388 modification petition by which she sought to have the minors returned to her care or, alternatively, to have unsupervised visits with them. Mary asserts she showed changed circumstances when she entered residential substance abuse treatment and her mental health needs were properly diagnosed. She further asserts the proposed modification was in the minors' best interests because they were strongly bonded to her and she was now able to maintain a healthy lifestyle.

A

Under section 388, a party may petition the court to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) Whether a previous court order should be modified and a change would be in the child's best interests are questions within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our decision for that of the juvenile court. (*In re Stephanie M.*, at pp. 318-319.) In ruling on a modification petition, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

B

Mary's petition alleged her circumstances had changed because she completed residential drug treatment, participated in an aftercare program, attended AA meetings, completed a parenting class, had been clean and sober for eight months and regularly visited the minors. However, Mary's petition and supporting documentation show, at most, her circumstances were "changing," but had not changed. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) Mary had a lengthy history of substance abuse and child

9

neglect. Six weeks after successfully completing services and reunifying with the minors in the first dependency case, Mary relapsed and the minors once again became dependents. She participated in more services and remained sober for nine months but, despite making progress toward reunification, she again relapsed on alcohol and began using methamphetamine. At the time of the section 388 hearing, Mary had not yet enrolled in a DUI program, was no longer in therapy and was not required to submit to random drug tests. Based on this evidence, the court could reasonably infer Mary's pattern of participating in services, getting sober but then relapsing showed she had not made the changes necessary to mitigate the protective issues. A petition like Mary's that alleges changing circumstances promotes neither stability for the child nor the child's best interests because it would mean delaying the selection of a permanent plan to see if a parent, who has failed to reunify with the child, might be able to reunify at some future point. (*In re Casey D.*, at p. 47.) "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

Even had Mary shown changed circumstances, she did not meet her burden of showing it would be in the minors' best interests to be returned to her custody or to have their permanent plans delayed by offering her unsupervised visits. For more than two years, the minors had experienced much emotional turmoil, due in part to Mary's inability to maintain her sobriety, manage her coping skills and put the minors' needs before her own. The minors desperately needed stability and permanence. A parent's high risk of relapse into drug use puts his or her interest in reunifying with the child directly at odds with the child's compelling right to a " 'placement that is stable, permanent, and that

10

allows the caretaker to make a full emotional commitment to the child.' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228.)

The court could reasonably find that placing the minors with Mary or ordering unsupervised visits would postpone stability for the minors, and would not be in their best interests compared to the certainty of a permanent home. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) The proper focus of this case was on the minors' need for stability and permanency, regardless of Mary's interest in reunification. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507.) The court acted well within its discretion by denying Mary's section 388 modification petition.

## II

Mary challenges the sufficiency of the evidence to support the court's finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude terminating parental rights. She asserts she maintained regular visitation and contact with the minors, who would benefit from continuing the parent-child relationship.

## A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1)

11

terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one or more of the enumerated statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if terminating parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances

12

the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575; accord *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Jason J., supra*, 175 Cal.App.4th at pp. 936-937.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review the court's finding regarding the applicability of a statutory exception to adoption for substantial evidence. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) In this regard, we do not consider the credibility of witnesses, resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) On appeal, the parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

Here, the evidence showed Mary maintained regular visitation and contact with the minors. However, she did not meet her burden of showing there was a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i).

Although the minors enjoyed visits with Mary and knew she was their mother, the relationship was not parental. To Elizabeth, Mary was like an extended family member. Although Madison had a strong bond with Mary, their relationship had negative aspects: they were more like siblings than parent and child, and there was some indication Madison had become parentified. The minors separated easily from Mary after visits and there was no evidence they were negatively impacted by the absence of Mary from their daily lives. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) Any positive bond, warmth and affection the minors shared with Mary was not enough to show they had a "significant, positive, emotional attachment" to her such that terminating the parent-child relationship would result in great harm to them. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

Further, Mary did not show that maintaining the parent-child relationship outweighed the benefits of adoption for the minors. At the time of the selection and implementation hearing, the minors had been dependents for more than two years and

14

had experienced much turmoil and instability. They were thriving in the home of the paternal grandmother, who was committed to adopting them. The minors need and deserve the stability, continuity and permanence that only an adoptive home can provide. The court was entitled to accept the social worker's opinion that the benefits of adoption for the minors outweighed the benefits of maintaining a relationship with Mary. (*In re Justice P., supra*, 123 Cal.App.4th at p. 191 [child's interest in stable and permanent home is paramount once a parent's interest in reunification is no longer at issue].) The court was required to, and did, weigh the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefits of an adoptive home for the minors. We cannot reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.) Substantial evidence supports the court's finding the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

DISPOSITION

The orders are affirmed.


McINTYRE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


NARES, J.

15